## UNITED STATES v. UNITED STATES GYPSUM CO. et al.
### Civil Action No. 8017.

District Court of the United States for the District of Columbia.

Aug. 10, 1943.

See, also, 37 F.Supp. 398.

Roscoe T. Steffen and Edward Knuff, Sp. Assts. to the Atty. Gen., for plaintiff.

Lewis Ulman, of Washington, D.C., and Bruce Bromley, of New York City, for defendants United States Gypsum Co., Sewell L. Avery and Oliver M. Knode.

Nicholas J. Chase, of Washington, D. C., and Elmer E. Finck, of Buffalo, N. Y., for defendants National Gypsum Co. and Melvin H. Baker.

Harold F. McGuire and F. W. H. Adams, both of New York City, and Leonard B. Ettelson and Stephen Allie, both of Chicago, Ill., for defendants Certain-teed Products Corporation and Henry J. Hartley.

Walter G. Moyle and Ralph P. Wanlass, both of Washington, D. C., and Andrew J. Dallstream and Norman Waite, both of Chicago, Ill., for defendants The Celotex Corporation and Bror G. Dahlberg.

Joseph P. Tumulty and Joseph P. Tumulty, Jr., both of Washington, D. C., and Alfred W. Varian and Herbert M. Simon, both of New York City, for defendants Ebsary Gypsum Company, Inc., and Frederick G. Ebsary.

James O'Donnell, Jr., of Washington, D. C., and Benjamin P. DeWitt, of New York City, for defendants Newark Plaster Co. and Frederick Tomkins.

George E. H. Goodner, of Washington, D. C., and D. I. Johnston, Roy C. Lytle, James R. Keaton, and Frank Wells, all of Oklahoma City, Okl., for defendant Samuel M. Gloyd, doing business under the trade name of Texas Cement Plaster Co.

Before STEPHENS, Associate Justice, United States Court of Appeals for the District of Columbia (Presiding), and BLAND and GARRETT, Judges, United States Court of Customs and Patent Appeals, designated as Justices of the District Court of the United States for the District of Columbia.*

---

* Holding a Three-Judge Statutory Court, pursuant to the provisions of 15 U.S.C.A. § 28, as amended by the Act of April 6, 1942, Public No. 515, 77th Congress, 2d Sess., 56 Stat. 198.

BLAND, Judge, and GARRETT, Judge:

The instant equity action was instituted by the Government in the District Court of the United States for the District of Columbia by complaint on August 15, 1940. The Government seeks, among other things, to obtain a judgment against the defendants enjoining them from certain alleged monopolistic practices and relationships in connection with trade and commerce in gypsum products between the states and the District of Columbia under sections 1, 2, and 3 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–3.

In a criminal action in said District Court, under an indictment returned June 28, 1940, the Government prosecuted the defendants under sections 1 and 3 of said Act. The pleadings in that case alleged a conspiracy to monopolize and restrain trade and commerce in certain gypsum products. On November 19, 1941, the trial judge sustained the motions of defendants for a directed verdict of not guilty. Judgment was entered accordingly.

The defendants, in this court, have moved, under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, for summary judgment upon the ground that in said criminal action, where it is urged that the parties and issues were substantially the same as those at bar, a judgment for defendants was obtained which is res judicata of the issues in the instant case and should be held by us to be a bar against the further prosecution of the instant action.

The motions have been argued and briefed at great length by both parties on three phases of the question: first, are the parties the same or substantially the same?; second, are the issues the same?; and third, was the judgment based on the trial judge's instruction made pursuant to defendants' motions for directed verdict in the nature of a demurrer to the evidence.

It is our view that if in the criminal case there had been an acquittal by the jury and a judgment rendered thereon, that judgment would not be res judicata of the issues in the instant case. This conclusion is amply supported by the following decisions: Helvering v. Mitchell, 1938, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917; Murphy v. United States, 1926, 272 U.S. 630, 47 S.Ct. 218, 71 L.Ed. 446; Lewis v. Frick, 1914, 233 U.S. 291, 34 S.Ct. 488, 58 L.Ed. 967; Stone v. United States, 1897, 167 U.S. 178, 17 S.Ct. 778, 42 L.Ed. 127; and United States v. Donaldson-Shultz Co., 4 Cir., 1906, 148 F. 581.

It is unnecessary, therefore, for us to express any view as to whether, for the purposes of this case, the parties and issues are the same, because even if they are, under the decisions above set out the judgment in the criminal case would not be res judicata of the issues in this civil proceeding. Nor is it necessary for us to make any holding with respect to the nature of the peremptory instruction given by the trial judge, since the question relating to whether defendants' motions for directed verdict were in the nature of a demurrer to the evidence has to do only with the question of whether or not there was an adjudication in that proceeding. As hereinbefore stated, if there had been such an adjudication as would have resulted from a judgment entered on a verdict of not guilty found by a jury on the merits, the doctrine of res judicata would not apply in the instant case.

The reasons why the doctrine does not apply in this kind of action are clearly expressed in a number of decided cases. For instance, the quantum of proof in a criminal case is wholly different from that required in a civil proceeding. Defendants may be required to testify in a civil proceeding but not in a criminal proceeding. Moreover, the most impelling reason, in our judgment, why res judicata does not apply in this case is that it is clear from the context of the Sherman Act that such a doctrine was never meant to apply. As the Supreme Court has said, it was the intention of Congress in providing for a criminal proceeding, an equity proceeding, and a suit by a damaged individual—all in one act—that concurrent remedies were to be afforded. Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107. Under such circumstances it would seem clear that a judgment in one action would not be a bar to obtaining a judgment in the others.

It seems to us that it would be wholly illogical to conclude that one charged with a violation of the Sherman Act could, by reason of an acquittal in a criminal case, thereby obtain immunity from any further remedy designed to bring about the discontinuance of a continuing offense.

While there is no decided case involving facts identical with those at bar, it seems to us that the principles in the above-cited

cases amply justify the conclusion that in cases like that at bar a full adjudication in a criminal action between the same parties and involving the same conspiracy would not be a bar in a subsequent civil action for injunctive relief.

In Murphy v. United States, supra, the defendant was acquitted of a charge of maintaining a nuisance and subsequently, in an equity action, was enjoined from occupying the place. The statute there, as here, contemplated both kinds of action, and the holding was that the second suit was not barred by the acquittal in the criminal action. Reasons for such conclusion were therein fully stated, and the doctrines laid down in Stone v. United States, supra, and Chantangco v. Abaroa, 1910, 218 U.S. 476, 31 S.Ct. 34, 54 L.Ed. 1116, were again relied upon and fully stated.

Defendants' said motions for summary judgment are denied.

## STEPHENS, J.:

I agree that the motions for summary judgment must be denied. But I do not agree with the views according to which my brothers reach this result, and I desire to state my own views separately. The importance of the motions warrants, I think, discussion of each of the questions raised thereunder.

The instant civil action, commenced by the United States (hereinafter for convenience referred to as the Government) August 15, 1940, seeks equitable relief under Section 4 of the Sherman Act. The complaint charges that the defendants for many years were parties to contracts, including patent license agreements, and were actively engaged in a continuing combination and conspiracy, in restraint of trade and commerce, and that they have monopolized trade and commerce, in gypsum products in violation of Sections 1, 2 and 3 of the Sherman Act.[1] The relief sought is a decree that the contracts, combination, conspiracy and monopoly are illegal and that the defendants have been parties thereto; that the defendants be enjoined from continuing to carry out the contracts, combination, conspiracy and monopoly; that they be required to cancel the provisions of the license agreements and enjoined from entering into any such agreements in the future and from bringing any actions for infringement of patents, or to collect royalties or license fees or profits for the use of patents now owned or controlled by them relating to gypsum products or relating to any process or machine used in connection with the same, until it is made to appear that all improper practices have been abandoned and the consequences of all misuses of the patents have been dissipated; that the defendants be enjoined from entering into any license agreement relating to gypsum products without obtaining the consent of the court; the prayer includes also a request for general relief.

The present motions for summary judgment, made under Rule 56 of the Federal Rules of Civil Procedure providing for such a judgment if the pleadings, depositions, admissions and affidavits on file in a civil case show that (except as to the amount of damages) there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law, are based upon pleas of res judicata embodied in two separate affirmative defenses. These are set forth in supplemental answers to the Government's complaint. From these answers and from affidavits supporting the same, it appears that prior to the filing of the complaint five of the seven corporate defendants[2] and two of the individual defendants named therein had been indicted by a grand jury for a combination and conspiracy to violate the antitrust laws and put to trial, but that at the close of the Government's case the defendants filed motions for a directed verdict and that the trial judge granted the same. The indictment is made a part of the supplemental answers. All of the foregoing is without dispute. It is contended by the defendants that comparison of the indictment with the complaint discloses, as a matter of law,

---

[1] 26 Stat. 209, July 2, 1890, as amended by 36 Stat. 1167, March 3, 1911, 50 Stat. 693, Aug. 17, 1937; 15 U.S.C.A. §§ 1, 2, 3, 4 (1940).

[2] While the complaint discloses that the name Texas Cement Plaster Company is the name of an unincorporated business venture of which the defendant Samuel M. Gloyd is the sole owner, throughout the briefs and argument on the motions for summary judgment this defendant is referred to as if a corporation, and therefore for uniformity and convenience it will be referred to as such in this opinion; whether this defendant is a corporation or an individual sole owner of an unincorporated business venture is immaterial to the questions involved on the motions.

that the causes of action in the two cases are the same, and it is urged that therefore the decision of the first case, adverse to the Government, forecloses, under the doctrine of res judicata, trial of the second. This is the first affirmative defense. In the alternative it is contended that, if the causes of action are different, the issues in the two cases are the same and hence cannot be relitigated in the instant civil suit. This is the second affirmative defense. For reasons which will be outlined later the Government opposes the motions for summary judgment. Greater detail of facts, as they appear from the complaint, the supplemental answers, the affidavits, and the indictment, will be stated below as necessary to discussion of particular topics. At the outset certain elementary principles are to be borne in mind.

## I.

The basis of the doctrine of res judicata has been well stated as follows:

"The doctrine of res judicata may be said to inhere in the legal systems of all civilized nations as an obvious rule of expediency, justice, and public tranquillity. Public policy and the interest of litigants alike require that there be an end to litigation which, without the doctrine of res judicata, would be endless. The doctrine . . . rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate, the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. The doctrine of res judicata not only puts an end to strife, but produces certainty as to individual rights and gives dignity and respect to judicial proceedings. It is considered that a judgment presents evidence of the facts of so high a nature that nothing which could be proved by evidence aliunde would be sufficient to overcome it; and therefore it would be useless for a party against whom it can be properly applied to adduce any such evidence, and accordingly he is estopped or precluded by law from doing so. . . ." [30 Am.Jur., Judgments, § 165]

The operation of the doctrine is well settled. A judgment in one action is a bar or estoppel against the prosecution of a second action between the same parties upon the same cause, and is a finality concluding parties, and privies, not only as to every matter which was offered or received to sustain or defeat the cause but also as to any other admissible matter which might have been offered or received. If the second action is upon a different claim or demand, then the judgment in the first acts as a bar only as to issues involved in both. Cromwell v. County of Sac, 1876, 94 U.S. 351, 24 L.Ed. 195. But the decision of an issue is a finality concluding parties and privies not only as to every matter which was offered or received to sustain or defeat that issue but also as to any other admissible matter which might have been offered or received. 2 Black on Judgments (2d ed. 1902) § 609, page 924; Southern Pacific Railroad v. United States, 1897, 168 U.S. 1, 18 S.Ct. 18, 42 L.Ed. 355. The doctrine of res judicata is applicable in successive criminal cases. United States v. Oppenheimer, 1916, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161, 3 L.R.A. 516. It is also applicable in a civil action where a prior criminal decision between the same parties has been adverse to the defendant on a question of fact. Local 167 v. United States, 1934, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804. If a court has once decided that the facts charged in a given case do not as a matter of law constitute a cause of action, no mere change in the form of the remedy pursued can alter that determination. Werlein v. New Orleans, 1900, 177 U.S. 390, 20 S.Ct. 682, 44 L.Ed. 817; Stoll v. Gottlieb, 1938, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104. The statement to the contrary in United States v. Schneider, C.C.D. Or., 1888, 35 F. 107, is in conflict with these two decisions; and Ash Sheep Co. v. United States, 1920, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507, cited to the contrary, is distinguishable.[3] Moreover, decision of a criminal case

---

3 Ash Sheep Co. v. United States involved two cases argued and decided together under Rev.Stat. § 2117, 25 U.S.C.A. § 179, providing that "Every person who drives . . . any . . . cattle, to range and feed on any land belonging to any Indian or Indian tribe, without the consent of such tribe, is liable to a penalty of one dollar for each animal of such stock." One case reached the Supreme Court on appeal from a decree granting the United States a permanent injunction restraining the Sheep Company from trespassing upon described Indian lands by grazing sheep thereon. It appeared that, although the amount of the statutory penalty for the trespass was prayed for in this equity suit, no evidence of sub-

against the Government by virtue of the application of principles of law to admitted facts will foreclose, under the doctrine of res judicata, relitigation of the same cause between the same parties not only in a subsequent criminal suit, United States v. Oppenheimer, supra, but also in a subsequent civil suit, see United States v. Salen, S.D. N.Y., 1917, 244 F. 296. Absent a violation of law in the facts charged in a criminal case there is no foundation for a subsequent civil suit. If there is no wrong there is nothing upon which to proceed either criminally or civilly. A contrary view would afford a plaintiff two opportunities to obtain a favorable ruling on admitted facts—directly in the teeth of the reasons underlying the doctrine of res judicata. A decision that admitted facts constitute no cause of action recognized by law is, of course, a final judicial disposition on the merits. Oscanyan v. Arms Co., 1880, 103 U.S. 261, 26 L.Ed. 539; United States v. Salen, supra. But decision of a criminal case by acquittal after submission to a jury upon the merits will not foreclose, under the doctrine of res judicata, relitigation of the same cause between the same parties in a subsequent civil proceeding. This is for the reason that in criminal cases a higher standard of proof, i. e., proof beyond a reasonable doubt, is requisite to conviction than is necessary in civil cases where proof by mere preponderance of the evidence is sufficient for a plaintiff's judgment, and for the further reason that in criminal cases, as distinguished from civil, proof·of criminal intent is necessary.[4] Helvering v. Mitchell, 1938, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917; Murphy v. United States, 1926, 272 U.S. 630, 47 S.Ct. 218, 71 L.Ed. 446; Lewis v. Frick, 1914, 233 U.S. 291, 34 S.Ct. 488, 58 L.Ed. 967; Stone v. United States, 1897, 167 U.S. 178, 17 S.Ct. 778, 42 L.Ed. 127; United States v. Donaldson-Shultz Co., 4 Cir., 1906, 148 F. 581. Coffey v.

stantial damage was introduced and the decree was limited to the recovery of one dollar and costs. The other suit reached the Supreme Court on writ of error in an action at law in which judgment had been rendered in favor of the United States and against the Sheep Company for the statutory penalty, in the sum of $5,000, for the same trespass. It was contended by the Sheep Company that the recovery of nominal damages in the equity suit was a bar to recovery of the penalty in the suit at law. The Supreme Court decided against this contention. It said: "Rejection of a claim because pursued in an action in which it cannot be entertained does not constitute an estoppel against the pursuit of the same right in an appropriate proceeding. We agree with the Court of Appeals that 'a judgment is not conclusive on any question which, from the nature of the case or the form of the action, could not have been adjudicated in the case in which it was rendered.'" 252 U.S. at page 170, 40 S.Ct. at page 244, 64 L.Ed. 507. It therefore affirmed in both actions.

But it is to be noted that in this case the issue of trespass had been adjudicated in the equity suit *in favor of the United States*, and it is not to be supposed that if the determination of that issue had been in favor of the Sheep Company such adjudication would not have been res judicata in the penalty suit merely because there was a different form of action involved. The explanation of the decision lies in the fact that in the equity suit there was no jurisdiction to assess a penalty, and since trespass was established in favor of the Government in both cases and since the statute afforded a penalty remedy to the United States, in addition to the equitable cause for restraint of trespass, there was no reason why the penalty could not be imposed in the law action. There was no adjudication in the equity suit against the recovery of a penalty for the reason that equity had no jurisdiction to pronounce such a decree and did not pronounce it. If the case be interpreted as holding that in successive actions on the same cause a decision in the first cannot be invoked under a plea of res judicata merely because a different form of action or remedy is pursued in the second, it is in conflict with the later decision of Stoll v. Gottlieb. The Ash Sheep Co. case would be apt for the instant case only as follows: If in the instant case the Government had *prevailed* in the criminal proceeding, thus establishing the existence of an illegal conspiracy to restrain interstate commerce, but upon an application for an injunction in such proceeding had been denied the same for the reason that a criminal court has no jurisdiction in equity, and if in answer to the civil complaint the defendants had pleaded res judicata and relied under that plea upon the refusal of the criminal court to issue an injunction, then they would be met by the decision in the Ash Sheep Co. case.

[4] This distinction as to intent, as will be more particularly pointed out below, is academic in the instant case.

United States, 1886, 116 U.S. 427, 6 S.Ct. 432, 29 L.Ed. 681, to the contrary has in effect been overruled by Helvering v. Mitchell and Stone v. United States.[5] An additional reason why an acquittal in a criminal case, after submission to a jury upon the merits, will not bar a subsequent civil suit between the same parties on the same cause is that in a civil suit a plaintiff has greater access than in a criminal case to evidence, through depositions and discovery, and to witnesses, since in a civil case the defendant may be required to testify (except where his answers to questions would be self-incriminating), as a result of which, again, a plaintiff may prevail in a civil action although the same cause pursued in the criminal proceeding against the same defendant failed. The absence of a right to an appeal from an adverse decision does not forbid application in a subsequent suit on the same cause between the same parties of the doctrine of res judicata. Johnson Company v. Wharton, 1894, 152 U.S. 252, 14 S.Ct. 608, 38 L.Ed. 429. Equally, the fact that the first case may have been erroneously decided is no obstacle to the application of the doctrine. United States v. Moser, 1924, 266 U.S. 236, 45 S.Ct. 66, 69 L.Ed. 262; United States v. Oppenheimer, supra; Straus v. American Publishers' Ass'n, 2 Cir., 1912, 201 F. 306.

It is contended by the Government that the doctrine of res judicata is not applicable where its operation would "limit the effectiveness" of a Federal statute and that this is true in respect of the antitrust laws. The cases cited by the Government to support the contention do not do so, and there is no authority to support it. Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, and Appalachian Coals, Inc. v. United States, 1933, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, merely state the general purposes and policies underlying the Sherman Act. In Stone v. United States, supra, and United States v. Donaldson-Shultz Co., supra, the courts in a civil suit rejected a plea of res judicata based upon an acquittal in a prior criminal action because, as pointed out above, of the higher degree of proof required in a

criminal case, and the necessity of establishing in such a case the element of criminal intent, and this is the theory of the decisions in Helvering v. Mitchell, Murphy v. United States, and Lewis v. Frick, supra, and Chantangco v. Abaroa, 1910, 218 U.S. 476, 31 S.Ct. 34, 54 L.Ed. 1116.[6] Sola Electric Co. v. Jefferson Electric Co., 1942, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. ——, decides merely that in a suit between private parties involving the validity of a patent under which a license has been granted, the licensee is not forbidden by local rules of estoppel to attack the validity of the patent, Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, not applying in such a situation. The case does not involve, nor did it discuss, the doctrine of res judicata—which is recognized generally in the Federal courts as well as locally. Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107, holds merely, so far as the contention under immediate discussion is concerned, that successive or simultaneous actions, criminal and civil, may be brought under the antitrust laws and that the order of trial of such actions is a matter for the discretion of the trial court. It involves no question of res judicata.

It is the contention of the defendants that within the principles above set forth they are entitled to prevail under the motions for summary judgment. They urge that the causes of action in the criminal case and the instant case are the same, despite the difference in remedy sought by the Government in the two cases, that the lack of complete mutuality of parties is not an obstacle, and that the nature of the disposition of the criminal case was such as to make inapplicable the rule that the doctrine of res judicata will not operate in a civil suit where the plea of res judicata is based upon acquittal by a jury in a criminal proceeding. The Government controverts all of these positions. Discussion of these questions follows.

## II.

Since a judgment in one action is a bar against the prosecution of a second suit be-

---

[5] An attempt was made in both Helvering v. Mitchell and Stone v. United States to distinguish Coffey v. United States upon the theory that the two statutes involved in that case were of penal character so that no difference in standard of proof was involved.

[6] Chantangco v. Abaroa is but a dictum.

tween the same parties only if the causes of action in the two cases are the same, the question whether the causes of action in the instant case and the criminal case are the same must next be answered.

Comparison of the indictment in the criminal case and of the complaint in the instant case discloses the following similarities in allegations: (a) Each charges a continuing combination and conspiracy to restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act. (b) Each charges that the combination and conspiracy involved gypsum board, including lath, plasterboard and wallboard (hereinafter referred to merely as gypsum board). (c) Each charges that the combination and conspiracy involved the manufacture and sale of substantially 100% of the gypsum board manufactured and sold in the United States east of the Rocky Mountains. (d) Each charges the combination and conspiracy to have been carried out over substantially the same area, i. e., the area east of the Rocky Mountains, including the District of Columbia. (e) Each charges the combination and conspiracy to have been carried out over substantially the same period of time—1929 to the date of the indictment (June 28, 1940) in the criminal case, 1929 to the date of filing the complaint (August 15, 1940) in the civil case.[7] (f) Each charges use of the same basic media for effectuating the combination and conspiracy, to wit, the license agreements of 1929 and 1930 fixing licensee prices for manufacturers, and fixing conditions of sale for such licensee manufacturers as a means of controlling distributors' resale prices.[8] (g) Each charges the fixing of resale prices of manufacturing distributors.[9] (h) Each charges, as a means of enforcing the combination and conspiracy, the policing of sales and the refusal of sales to those who would not abide price schedules. (i) Each charges the elimination of jobbers.[10] (j) Each describes the combination and conspiracy as having been intentionally carried out. (k) Five corporations (United States Gypsum Company, National Gypsum Company, Certain-teed Products Corporation, Ebsary Gypsum Company, Inc., and Newark Plaster Company) and two individuals (Oliver M. Knode and Melvin H. Baker) are common to the indictment and complaint as defendants.[11] Also both the indictment and the complaint name as manufacturers of gypsum board alleged to have been co-conspirators in the combination and conspiracy common corporate persons

---

[7] The complaint alleges negotiations and contracts between the defendants, or some of them, as early as September 1925, and at one point states that "The combination was formed during the period between the month of September 1925 and early in the year 1930"; but the complaint also refers to "the formation of said combination in the year 1929," and that date seems to be, on the whole of the complaint, the time charged as the time of formation of the combination.

[8] A "manufacturer," according to the allegations of the complaint, is one who converts raw gypsum into gypsum board (a complicated operation), gypsum plaster and other finished gypsum products and sells them, largely to dealers, although in part, in the case of gypsum board, also to "manufacturing distributors."

[9] A "manufacturing distributor" is one who converts raw gypsum into gypsum plaster (a relatively simple process), but who, not being equipped for the more complicated operation of making gypsum board, buys the latter from the manufacturer and resells it, along with its own gypsum plaster, to dealers.

[10] The civil complaint specifically charges concertedly refraining from distributing gypsum board and other products through jobbers, and refusing to sell to jobbers with the effect of eliminating substantially all jobbers from the distribution of gypsum products. The elimination of jobbers is not in terms charged in the indictment, but the brief of the Government in opposition to the motions for summary judgment states that although the allegation of the civil complaint of the elimination of jobbers was not a part of the charge of the indictment, elimination of jobbers was mentioned in the indictment as one of the means whereby resale prices were controlled; and it is further stated in the brief of the Government that in the course of the trial of the criminal case evidence was introduced showing the elimination of jobbers from the industry between 1930 and 1932.

[11] Apart from the question whether there exists the mutuality of parties conventionally required by the doctrine of res judicata, identity of defendants, co-conspirators and persons alleged to have been affected by a combination and conspiracy may tend to characterize or identify the same. The question of mutuality as such is discussed in topic III of this opinion.

(some of whom are named defendants and some not) as follows:

(b) The indictment charges violation of Sections 1 and 3 only of the Sherman Act,

| Indictment | Complaint in Equity |
| --- | --- |
| United States Gypsum Company (defendant) | United States Gypsum Company (defendant) |
| National Gypsum Company (defendant) | National Gypsum Company (defendant) |
| Certain-teed Products Corporation (defendant) | Certain-teed Products Corporation (defendant) |
| The American Gypsum Company | The American Gypsum Company<br>The Celotex Corporation (defendant) (which acquired The American Gypsum Company) |
| Ebsary Gypsum Company, Inc. (defendant) | Ebsary Gypsum Company, Inc. (defendant) |
| Kelley Plasterboard Company, Inc. | Kelley Plasterboard Company, Inc. |
| Newark Plaster Company (defendant) | Newark Plaster Company (defendant) |
| Universal Gypsum & Lime Company | Universal Gypsum & Lime Company |
| Atlantic Gypsum Products Company | Atlantic Gypsum Products Company |
| Texas Cement Plaster Company [12] | Texas Cement Plaster Company (defendant) |

It will be noted that identity in these last named persons is complete except for The Celotex Corporation (which acquired The American Gypsum Company). Still further, both the indictment and the complaint name as manufacturing distributors whose resale prices are alleged to have been controlled pursuant to the combination and conspiracy, the following:[13]

whereas the complaint charges also a violation of the monopoly provisions of Section 2. (c) The indictment describes as the subject of the conspiracy the manufacture and sale of gypsum board, whereas the complaint adds also gypsum plaster, tile, cement, perforated lath and metallized lath. (d) The indictment limits its charge of illegality to commerce in such gypsum board

| Indictment | Complaint in Equity—Bill of Particulars |
| --- | --- |
| *Alleged to have been co-conspirators on resale prices:* | *Alleged to have agreed on resale prices:* |
| Structural Gypsum Corporation | Structural Gypsum Corporation |
| American Cyanamid & Chemical Corporation | American Cyanamid & Chemical Corporation |
| Connecticut Adamant Plaster Company | Connecticut Adamant Plaster Company |
| Oakfield Gypsum Products Corporation | Oakfield Gypsum Products Corporation |
| The Calvin Tomkins Company | The Calvin Tomkins Company |
| Grand Rapids Plaster Company | Grand Rapids Plaster Company |
| Michigan Gypsum Company | Michigan Gypsum Company |
| The Alabastine Company | The Alabastine Company |
| Wasen Plaster Company | Wasen Plaster Company |

The indictment and complaint disclose also certain differences: (a) The indictment charges a combination and conspiracy in restraint of trade in violation of Sections 1 and 3 of the Sherman Act, whereas the complaint charges also a contract in restraint of trade in violation of Section 1.

as was sold by the defendants through jobbers and manufacturing distributors, asserted to have comprised less than 5% of the total of the defendants' commerce in gypsum board, whereas the charge of illegality in the complaint concerns also commerce in gypsum board sold by the

12 Not named as a "co-conspirator" in the indictment, but referred to as having "participated in the alleged conspiracy."

13 The following additional persons were named in the indictment but not in the complaint as co-conspirators on resale prices: Mathieson Alkali Works, Inc.; Wallboard Wholesalers, Inc.; Plastergon Wallboard Company.

manufacturers, i.e., the defendants themselves. (e) The complaint charges not only the fixing of resale prices of manufacturing distributors and the elimination of jobbers, as does the indictment as above explained, but also three additional consequences of (or means of effectuating) the conspiracy, to wit, concertedly raising and fixing at arbitrary and non-competitive levels the prices of gypsum board manufactured and sold by the defendants themselves in the eastern area, concertedly standardizing gypsum board and its method of production with the effect of eliminating competition, and concertedly raising, maintaining and stabilizing the general level of prices for plaster and miscellaneous gypsum products. (f) The indictment does not question the legality of the license agreements of 1929 and 1930, whereas the complaint charges that the conditions fixed in the agreements are not within the limits permitted to patentees and their licensees in United States v. General Electric Company, 1926, 272 U. S. 476, 47 S.Ct. 192, 71 L.Ed. 362. (g) The indictment does not challenge the validity of the patents upon which the license agreements are based, whereas the complaint does. (h) The complaint names two corporate defendants (The Celotex Corporation and the Texas Cement Plaster Company) and five individual defendants (Sewell L. Avery, Henry J. Hartley, Bror G. Dahlberg, Frederick G. Ebsary and Frederick Tomkins) not named as defendants in the indictment, and The Celotex Corporation is not named in the indictment even as a co-conspirator, although The American Gypsum Company, which it acquired, is so named.[14] Still further, as noted above in footnote 13, the indictment names as manufacturing distributors whose resale prices are alleged to have been controlled pursuant to the combination and conspiracy three persons (Mathieson Alkali Works, Inc., Wallboard Wholesalers, Inc., and Plastergon Wallboard Company) not named in the complaint. (i) The purpose of the indictment is punitive, whereas the prayer of the complaint is for restraint.[15]

The conventional test to determine whether two causes are the same is—will the same evidence support both; if it will, the two causes are the same, otherwise not. Stone v. United States, 9 Cir., 1894, 64 F. 667, 671, quoting from 1 Freeman on Judgments § 259; 2 Black on Judgments (2d ed. 1902) § 726, page 1089. But by cause of action for the purpose of this test of identity is meant the same in gist or material elements. As said in Baltimore S. S. Co. v. Phillips, 1927, 274 U.S. 316, 321, 47 S.Ct. 600, 71 L.Ed. 1069: "The *thing,* therefore, which in contemplation of law as its *cause,* becomes a ground for action, is not the group of *facts* alleged in the declaration, bill, or indictment, *but the result of these in a legal wrong, the existence of which, if true, they conclusively evince."* [16] To the same effect see United States v. California & Oregon Land Co., 1904, 192 U.S. 355, 24 S.Ct. 266, 48 L.Ed. 476; Werlein v. New Orleans, supra; McKnight v. Minneapolis St. R. Co., 1914, 127 Minn. 207, 149 N.W. 131, L.R.A.1916D, 1164. While allegation of a purpose to commit and of the actual commission of one or more overt acts may tend to characterize

[14] Also the indictment names seven individual defendants (William L. Keady, H. Frank Sadler, Sidney F. Bartlett, Ernest A. Gallagher, Ralph F. Burley, Warren F. Henley, Arthur R. Black) not named as defendants in the complaint; they are joined in the indictment, however, as officers engaged in the control of the affairs of corporations three of which (the United States Gypsum Company, the National Gypsum Company, and the Certain-teed Products Corporation) are named as defendants in both indictment and complaint, and one of which (The American Gypsum Company) was named in the indictment as a co-conspirator and is charged in the complaint to have been acquired by The Celotex Corporation, named in the complaint as a defendant.

No point is made by the Government, in respect of the question of identity of causes, of the fact that these seven individuals are named as defendants in the indictment but not in the complaint. This fact is here mentioned only for the purpose of completeness of descriptive comparison.

[15] The Government asserts as an additional difference between the indictment and the complaint that the companies described in both as manufacturing distributors whose resale prices are alleged to have been controlled pursuant to the conspiracy are charged in the indictment to have been "co-conspirators" in respect of such resale prices, whereas in the complaint they are alleged merely to have agreed on resale prices. This is a mere verbalistic difference.

[16] This quotation was from Chobanian v. Washburn Wire Company, 1911, 33 R.I. 289, 302, 80 A. 394, Ann.Cas.1913D, 730, which case itself was quoting from Sibley, Right to and Cause for Action, 48.

a conspiracy as having existed at some given time or place, overt acts are not vital parts of a conspiracy to violate the antitrust laws. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 224-226, 60 S.Ct. 811, 84 L.Ed. 1129; Nash v. United States, 1913, 229 U.S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232. As said in the latter case, wherein an indictment charging a conspiracy to restrain trade by means of depressing prices, underselling competitors for the purpose of forcing them out of business, and the like, was demurred to upon the ground that no overt acts were charged: "Coming next to the objection that no overt act is laid, the answer is that the Sherman Act punishes the conspiracies at which it is aimed on the common law footing—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability. . . ." It follows that causes of action for conspiracy proceeded upon in two different suits may be legally identical despite the fact that the allegations of the complaints in the two cases are not strictly duplicate. As was said in United States v. Meyerson, S.D. N.Y.,1928, 24 F.2d 855, 857: "Nor can the effect of the former adjudication of acquittal be avoided by adding new elements to the old scheme, and thus broadening the charge of conspiracy. . . ." This is explained with greater particularity below. Even different (in the sense of overlapping) periods of time over which conspiracies described in two different cases are alleged to have operated may be charged, Straus v. American Publishers' Ass'n, supra, or both different (in the sense of overlapping) areas and periods of time, Powe v. United States, 5 Cir., 1926, 11 F.2d 598, 599-600, and yet the two causes of action be the same. It is true that under the Sherman Act a monopoly, as described in Section 2, is a different offense from a contract, combination or conspiracy in restraint of trade as described in Section 1. United States v. MacAndrews & Forbes Co., C.C.S.D.N.Y.1907, 149 F. 836. It is also true that a monopoly may be separate from a conspiracy to monopolize, United States v. Shapiro, 2 Cir., 1939, 103 F.2d 775, 776, and that more than one conspiracy may arise out of a given transaction between a variety of parties, Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. Nevertheless, it does not necessarily follow from the fact that several different crimes are alleged to have resulted from concerted action by a plurality of defendants that more than a single conspiracy is charged. Braverman v. United States, 1942, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. ——. Therefore the fact that in one complaint the defendants are charged with having conspired to commit several crimes, while in another the same defendants are charged to have conspired to commit the same crimes plus one or more others, does not necessarily render the causes of action stated in each of the two cases different. It is true that usually the cause of action in a criminal case involves an element of intent not ordinarily involved in a civil cause, and, as said above, this has been held so to differentiate a criminal from a civil cause, both based upon the same act, as to make inappropriate application of the doctrine of res judicata where an acquittal in a criminal case is pleaded in bar of a subsequent civil suit. Helvering v. Mitchell and companion cases cited supra. But this difference between civil and criminal causes generally is academic in respect of criminal and civil causes under the antitrust laws where in the civil case the illegal acts charged as wrongful are alleged to have been intentional. In respect of crimes charged under such laws no specific intent is a requisite. Questions of wilful purpose or conscious design to violate the antitrust laws and to inflict injury are not involved—persons combining or contracting to restrain commerce or create a monopoly will be presumed to have intended the necessary and natural consequences of their acts and agreements. United States v. Patten, 1913, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.(N.S.) 325; 41 C.J., Monopolies, § 65.

If the identities and differences between the indictment and the complaint be considered in the light of the foregoing principles, it will be seen that the causes of action pursued in the instant case and in the criminal case are the same. So far as the differences are concerned: (a) The inclusion in the complaint of a charge of "contract" in restraint of trade is but a mere formal characterization in the complaint of what was actually described also in the indictment, to wit, the use of agreements, i.e., the license agreements, as the basic media for effectuating the combination and conspiracy. Mere lack of duplication in allegations will not make two causes legally distinct. (b) Inclusion of a monopoly in the charge of the complaint and not in that of the indictment is but the addition

of an overt act, or consequence; and even though monopoly is a crime distinct from combination and conspiracy, that does not, in view of Braverman v. United States, supra, render different the causes of action sued on by the Government in the two cases. (c) The inclusion in the complaint of gypsum plaster, tile, cement, and perforated and metallized lath, in addition to the gypsum board mentioned in both the indictment and the complaint, as the products or items of manufacture and merchandising with which the combination and conspiracy was concerned, is not a legally differentiating factor. It is but an addition of facts which enlarge the scope of the conspiracy, rather than alter its identity. (d) The fact that the indictment named as manufacturing distributors whose resale prices are alleged to have been controlled pursuant to the combination and conspiracy three persons (Mathieson Alkali Works, Inc.; Wallboard Wholesalers, Inc.; Plastergon Wallboard Company) not named in the complaint is obviously too inconsequential a difference in respect of persons alleged to have been affected to distinguish the combination and conspiracy described in the indictment from that described in the complaint. (e) The inclusion in the complaint, as compared with the indictment, of three additional consequences of (or means of effectuating) the combination and conspiracy is again but the addition of overt acts and these, as said above, are not vital to a conspiracy to violate the antitrust laws. (f) The charge in the complaint, as distinguished from the indictment, of illegality in the license agreements of 1929 and 1930, and (g) the attack in the complaint, but not in the indictment, upon the validity of the patents upon which the license agreements are based, do not necessarily make the cause of action sued on in the complaint different from that involved in the indictment. Here must be emphasized the principle enunciated in the quotation from Baltimore S. S. Co. v. Phillips, supra, and exemplified also in United States v. California & Oregon Land Co., Werlein v. New Orleans, and McKnight v. Minneapolis St. R. Co., supra, that the thing which in contemplation of law as its cause becomes a ground for action is not the group of facts alleged but the result of these in a legal wrong. In each of those cases it was contended that differing allegations of fact in two successive cases so differentiated the causes of action involved as to make inapplicable in the second a plea of res judicata based upon the decision in the first. But in each of those cases it was held that since the facts alleged in the second suit, although different from those asserted in the first, nevertheless lent support to the same cause of action as was sued on in the first, the doctrine of res judicata was applicable. The cases referred to are stated, and pertinent portions of the opinions quoted, in the margin.[17] These decisions

---

[17] In Baltimore S. S. Co. v. Phillips, Phillips brought suit for injury by the negligent use of appliances on a steamship. The Steamship Company pleaded res judicata, asserting as a basis for the plea a previous adjudication in its favor and against the same plaintiff for the same injury alleged to have been occasioned by the defendant's use of defective appliances. The trial court rejected the plea of res judicata and the Circuit Court of Appeals affirmed, concluding that the cause of action set up in the second case was not the same as that set up in the first because the grounds of negligence pleaded were different and distinct in character. The Supreme Court reversed. It said (274 U.S. at page 321, 47 S.Ct. at page 602, 71 L.Ed. 1069):

". . . Upon principle, it is perfectly plain that the respondent suffered but one actionable wrong and was entitled to but one recovery, whether his injury was due to one or the other of several distinct acts of alleged negligence or to a combination of some or all of them. In either view, there would be but a single wrongful invasion of a single primary right of the plaintiff, namely, the right of bodily safety, whether the acts constituting such invasion were one or many, simple or complex.

"A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. The mere multiplication of grounds of negligence alleged as causing the same injury does not result in multiplying the causes of action. 'The facts are merely the means, and not the end. They do not constitute the cause of action, but they show its existence by making the wrong appear. . . .'" (Then followed the statement quoted in the text supra.)

In Werlein v. New Orleans, New Orleans brought suit in a Louisiana state court to recover, upon the ground that it had been dedicated to public use and was inalienable, a tract of land acquired by Werlein

put it beyond doubt that where in two successive actions between the same parties it is sought in the second to defeat, upon the ground that the causes of action are different, a plea of res judicata based upon the first, the test of identity, i.e., whether the same evidence will support each charge, must be applied not in terms of the mere facts, theories or pleadings specifically relied upon in each, but in terms of the ultimate wrong sued on. It is of course true that the question what wrong is sued on must be determined from the allegations in the respective plaintiff's pleadings. But if from the four corners of the pleadings in each of the two cases it appears that the

---

through mesne conveyances originating in a marshal's sale to satisfy a judgment in favor of one Klein. In support of a plea of res judicata Werlein offered in evidence a prior decree in equity in favor of Klein in proceedings brought by New Orleans to enjoin the marshal's sale. The trial court refused to admit the decree, in part for the reason that the thing demanded in the two suits was not the same, the prayer in the first suit, against Klein, being for an injunction restraining the sale, whereas in the action against Werlein the demand was for a decree declaring the sale null and void; the trial court's refusal to admit the decree was, however, for the following further reason: It appeared that the unsuccessful suit of New Orleans to enjoin the marshal's sale in behalf of the judgment creditor Klein had been based upon the grounds (1) that Klein had registered the judgment in the Office of the Administrator of Public Accounts for New Orleans in accordance with a legislative act of 1870 as a result of which Klein had no right to sell the property under a writ of fieri facias; (2) that Klein had assigned his interest in the judgment before issuance of the writ; (3) that the writ was issued for a sum larger than that due on the judgment. The contention made in the second suit that no right or title passed by virtue of the marshal's sale because the tract in question had prior thereto been dedicated to public use and was therefore not susceptible of alienation or private ownership or possession, was not made in the first action. The Supreme Court reversed the ruling of the trial court that the decree in the first suit could not be admitted in evidence under the plea of res judicata. It said:

"It is, however, contended that as the city had only set up certain facts as the foundation of its action to prevent the alleged illegal sale of the property, the judgment only bound it as to those facts, and therefore it is now urged that the city in this action was at liberty to prove other facts which would also show that Klein had no right to sell the property, namely, that the property had long before the sale been dedicated to public use, and the city therefore had no right to alienate it, nor had any one the right to sell it upon an execution issued on a judgment against the city.

"It is not disputed that if there were no question of a prior judgment in this case, proof that the land had been properly and duly dedicated for a public square to the public use and therefore had been withdrawn from commerce, would furnish a defence to the claim by any person of a right to sell the property under an execution upon a judgment against the city. New Orleans v. United States, 10 Pet. 662, 731, 736 [9 L.Ed. 573, 600, 602]; Police Jury v. Foulhouze, 30 La.Ann. 64; Police Jury v. McCormack, 32 La.Ann. 624; Kline v. Parish of Ascension, 33 La.Ann. 562; Leonard v. City of Brooklyn, 71 N.Y. 498, 27 Am.Rep. 80.

"Assuming the law to be as thus stated, the question in this case is, what effect has this judgment under discussion upon the rights of the parties?

"The fact now alleged would have furnished in the chancery suit but another ground or reason upon which to base the claim of the city, that Klein had no right to sell the property under his writ. In other words, it would have been additional proof of the cause of action set forth in that suit. The city would have had the right to set that fact up in its bill and to have proved it on the trial, and, if proved, it would have been foundation for a judgment enjoining the sale of the property; but the fact would have been nothing more than evidence of the right of the city to obtain the injunction asked for in the chancery suit, and we think it was the duty of the city to set up in that suit and to prove any and all grounds that it had to support the allegation that Klein had no right to seize or sell the property.

"The threatened sale might have been illegal for a number of reasons, based upon widely divergent facts, but whatever those reasons were, the facts upon which they rested were open to proof in the chancery action, and if the city desired the benefit of them, they should have been alleged and proved. It would seem to be quite clear that the plaintiff could not be permitted to prove each independent fact in a separate suit. Suppose the city had only set up the fact of the registry of the judgment as a ground for enjoining the sale, and after a trial on that issue it had been beaten and judgment had gone against it, could the city after that have commenced another suit for the same purpose, and set up as

wrong sued on in each is the same, then the assertion in the second case of facts wholly different from those asserted in the first will not defeat the plea. In short, "the same evidence test," if applied with complete literalness, is valid as a positive but not as a negative test for determining the identity of causes. Obviously, if exactly the same items of evidence would be requisite to the establishment of a plaintiff's case as pleaded in each of two actions between the same parties, the two causes relied upon must be the same—because the allegations would be identical and therefore could describe but one and the same legal wrong. But, as illustrated in the

a ground for the alleged illegality of the sale the assignment of the judgment by Klein? In such second action would not the judgment in the prior action conclude the city? If not, then on being beaten on a trial of that issue the city could commence still another action based on the allegation that the judgment had been paid. Thus, as many different actions as the city might allege grounds for claiming the sale would be illegal could be maintained *seriatim*, and no one judgment would conclude the city except as to the particular ground upon which the city proceeded in each particular case. And yet all these different grounds would simply form evidence upon which the original cause of action was based, namely, the alleged illegality of the apprehended sale. They would form simply separate facts upon which the cause of action might rest. There is no difference in the nature of the ground now urged in this case from the other grounds actually set up in the chancery suit.

"It is true that in the chancery suit the thing demanded was an injunction restraining Klein from selling the property, while in this suit it is a decree declaring the sale effected by Klein absolutely null and void. But the two demands, though different in terms, are in substance the same, and are founded upon the same cause of action, viz., the total illegality of the sale, whether threatened or accomplished. . . ." (177 U.S. at pages 398–400, 20 S.Ct. at page 685, 44 L.Ed. 817)

In United States v. California & Oregon Land Co., the United States by a bill in equity sought to have declared void a patent to certain lands acquired by the Land Company through mesne conveyances from the original patentee. An Act of Congress of July 2, 1864, 13 Stat. 355, granted lands to the state of Oregon to be sold in aid of the construction of a wagon road. The original patentee had taken under such a sale. The contention of the Government in this equity suit was that the particular lands involved therein were the subject of a proviso reserving them for an Indian Reservation and that as a result they were never the proper subject of patent. The Land Company pleaded a prior adjudication in its favor in a suit brought by the Government to declare the same patent void. It appeared, however,

that the grounds of the first suit were these: Under the Act of July 2, 1864, the issuance of patents was conditioned upon the completion of the wagon road within a given period of time. Later, it having been made to appear to Congress that this condition in several similar grants had not been performed, Congress by an Act of March 2, 1889, 25 Stat. 850, provided for the bringing of suits against all claimants of any interest under the grant of 1864 and certain others to determine the question of the seasonable and proper completion of the roads in accordance with the terms of the granting acts, and authorized the United States Circuit Court to render judgments of forfeiture "saving and preserving the rights of all *bona fide* purchasers of either of said grants or of any portion of said grants for a valuable consideration, if any such there be. . . ." It was made to appear under the plea in the second suit that the decision in the first suit against the Government was upon the ground that the Land Company was a *bona fide* purchaser for value. It was held that, notwithstanding the difference between the grounds upon which the Government relied in the two suits, the decree in the first operated as a bar of the second. The Court said:

"On the general principles of our law it is tolerably plain that the decree in the suit under the foregoing statute would be a bar. . . . The best that can be said, apart from the act just quoted, to distinguish the two suits, is that now the United States puts forward a new ground for its prayer. Formerly it sought to avoid the patents by way of forfeiture. Now it seeks the same conclusion by a different means, that is to say, by evidence that the lands originally were excepted from the grant. But in this, as in the former suit, it seeks to establish its own title to the fee.

"It may be the law in Scotland that a judgment is not a bar to a second attempt to reach the same result by a different *medium concludendi*. Phosphate Sewage Co. v. Molleson, 5 Ct. of Sess.Cas. (4th Ser.) 1125, 1139; although in the same case on appeal Lord Blackburn seemed to doubt the proposition if the facts were known before. S.C., 4 App.Cas. 801, 820. But the whole tendency of our decisions is to require a plaintiff to try his whole cause

626

cases discussed in the margin, the same legal wrong may be found relied upon in each of two cases despite the fact that the pleadings may differ—in that in one the wrong is described in terms of the assertion of but a part of the facts actually available to establish it, whereas in the other these facts are omitted and the remainder stated. In such event, obviously, the evidence admissible under the pleadings in the two cases will be different; yet the causes of action are the same. Putting this still otherwise: There is a totality of facts out of which every legal wrong grows; but a single wrong cannot be made the basis of a plurality of actions by alleging in one case but a part of that totality and in another or other cases the remainder thereof. *A fortiori,* a single wrong cannot be made the basis of a plurality of actions by alleging in one case (as in the criminal case involved in the instant situation) but a part of the totality of facts out of which the wrong grows and in another (as in the instant civil case) again alleging that part *plus* the remainder.

So far as (h) the difference in parties is concerned '(referred to at this point in respect not of the question of mutuality but of the question whether the two causes of action are the same): A cause of action thought of apart from the parties is a mere abstraction. Hence a combination and conspiracy described as having been entered into and effectuated by defendants A to H inclusive as the totality of defendants involved might be thus characterized as a different combination and conspiracy from one described as involving the same agreement and activities by defendants I to P inclusive, if these also were asserted to be the totality of defendants involved; that

---

of action and his whole case at one time. He cannot even split up his claim, Fetter v. Beale, 1 Salk. 11; Trask v. Hartford & New Haven Railroad, 2 Allen [Mass.] 331; Freeman, Judgments, 4th ed. §§ 238, 241; and, *a fortiori,* he cannot divide the grounds of recovery. Unless the statute of 1889 put the former suit upon a peculiar footing [the Court held that it did not], the United States was bound then to bring forward all the grounds it had for declaring the patents void, and when the bill was dismissed, was barred as to all by the decree. . . ." (192 U.S. at pages 357-358, 24 S.Ct. at page 267, 48 L.Ed. 476).

In McKnight v. Minneapolis St. R. Co., McKnight, in an action alleging injury through alighting from a defective step on the Street Railway Company's car, sought to avoid a plea of res judicata, based upon a previous judgment for the Street Railway Company, by showing that the charge in the previous action was injury through negligent closing of the gates and starting of the car while McKnight was alighting. Relying upon the proposition that two causes of action are the same only if the same evidence will support each of them, McKnight contended that as she did not allege and hence could not prove the defect in the step in the first suit, and had not alleged and hence could not prove the negligent starting of the car in the second suit, the latter was not based on the same cause of action as the former. But the Supreme Court of Minnesota, in affirming the decision of a state district court that the judgment in the first action barred recovery in the second, held that the contention of McKnight was fallacious, that the same evidence test applies not to the cause merely as pleaded but to the ultimate wrong for which redress is sought. In respect of the contention that the two causes of action were not, for the reasons urged, the same, the court said:

". . . This does not necessarily follow. In arriving at this conclusion plaintiff overlooks the rule stated in Thompson v. Myrick, supra [1877, 24 Minn. 4], and repeatedly reiterated in later cases, that the judgment decides 'every matter which pertains to the cause of action, * * * even though such matter may not be set forth in the pleadings so as to admit proof' thereof; and that 'all claim for relief, special or general, upon the same cause of action or defense, is disposed of and determined by the judgment, when the particular circumstances justifying such relief are not pleaded, as effectually as when they are fully set out;' and that such judgment bars a second suit which 'presents no new cause of action but only new grounds for relief upon the same cause of action.' The test is not whether the two complaints are so drawn that the same evidence would be admissible under both, but whether the same evidence which will sustain the cause of action upon which a recovery is sought in the second suit would also have sustained the cause of action upon which a recovery was sought in the first suit. Whether the instant case falls within or without the rule depends upon whether the wrong for which redress is sought is the same wrong for which redress was sought in the former suit, and not upon whether the complaint sets forth grounds for relief which were not set forth in the former complaint. . . ." (149 N.W. at page 133)

is to say, complete disidentity of defendants might differentiate causes, although partial disidentity might not. But difference in parties in the two cases under discussion is but partial and does not distinguish the two causes. The individuals added in the civil complaint are charged as officers of corporate defendants named in the indictment. Since a corporation can act only through human agents, this is not a distinguishing factor. And the addition of two corporate defendants in the civil case (The Celotex Corporation and the Texas Cement Plaster Company) does not materially distinguish the causes, especially since The Celotex Corporation is charged in the civil case with having acquired The American Gypsum Company, which was itself named in the indictment as a co-conspirator with the indicted defendants. That there are named in the indictment as manufacturing distributors whose resale prices are alleged to have been controlled pursuant to the combination and conspiracy three persons (Mathieson Alkali Works, Inc.; Wallboard Wholesalers, Inc.; Plastergon Wallboard Company) not named in the complaint is obviously too inconsequential a difference in respect of persons alleged to have been affected to distinguish the combination and conspiracy described in the complaint from that set forth in the indictment.

Finally, the fact that (i) the purpose of the indictment is punitive, whereas the prayer of the civil complaint is for restraint, is not of itself sufficient to differentiate the causes of action involved in the two cases and so to defeat the pleas of res judicata. This constitutes merely a difference in the form of action or remedy. Stoll v. Gottlieb, Werlein v. New Orleans, supra.

Scrutiny, in the light of the foregoing principles, of all of the allegations of the indictment and of the complaint demonstrates that, notwithstanding that facts are asserted in the complaint which are not asserted in the indictment, the legal wrong sued on in each of the cases is the same, to wit, concerted restraint of trade in gypsum products over the eastern area of the United States from 1929 to 1940 by substantially the same defendants. The causes of action in the two cases are therefore the same. All of the facts added in the complaint were available to the Government when it filed the indictment, both the indictment and the complaint having been filed as above appears at substantially the same time. The Government chose to omit these facts in the criminal case; it cannot now say, to avoid the pleas of res judicata, that when added in the civil suit they make it a different cause.[18]

## III.

The question of mutuality of parties: As has been stated above five individual and two corporate persons are named as parties in the civil complaint who were not so named in the indictment. Does this lack of strict mutuality forbid application of the doctrine of res judicata?

As appears from the statement of the doctrine of res judicata set forth at the outset of this opinion, the finality of a judgment relied upon to bar a second action between the same parties on the same cause applies not only in favor of the parties but also in favor of those in privity with them. Where in the first suit the defendants are corporations alone, whereas in the second individual officers are also named as defendants but are charged in no other capacity than as officers of the corporation, such officers are treated as in privity with their corporations and therefore entitled to the benefit of the judgment entered in favor of the latter in the prior action. Straus v. American Publishers' Ass'n.

[18] Even if the question of identity of causes be discussed in the terms used by the Government in its brief, wherein it compares the facts set out in the indictment and in the complaint, the contention of the Government that the causes of action in the two cases are different is much weakened by the fact that the civil complaint charges as one of the effects of the conspiracy the fixing of the resale prices of manufacturing distributors, and that that identical consequence is charged as the principal result of the conspiracy described in the indictment. It is difficult to understand how the two conspiracies can be different when the same consequence is asserted to flow from each. Again, in the Government's motion in the civil case for an order directing the defendants to admit the genuineness of documents offered in the criminal case, it was stated in the Government's affidavit that ". . . the matters with which the defendants stood charged in United States v. United States Gypsum Company et al (Criminal No. 66008) [D.C., 37 F.Supp. 398] are the same matters with which they are charged in paragraphs 94, 95, and 108–111 of the complaint in the present action . . . ." These paragraphs have to do with elimination of jobbers and concerted control of manufacturing distributors.

supra. In certain circumstances there is a further exception to the requirement of strict mutuality of parties for application of the doctrine of res judicata. As was said in Coca-Cola Co. v. Pepsi-Cola Co., 1934, 6 W.W.Harr. 124 (Del.Super.), 172 A. 260, 263:

". . . a plaintiff who deliberately selects his forum and there unsuccessfully presents his proofs, is bound by such adverse judgment in a second suit involving all the identical issues already decided. The requirement of mutuality must yield to public policy. To hold otherwise would be to allow repeated litigation of identical questions, expressly adjudicated, and to allow a litigant having lost on a question of fact to re-open and re-try all the old issues each time he can obtain a new adversary not in privity with his former one."

In 1 Freeman on Judgments (5th ed. 1925) § 429, pages 935-6, the author puts it thus:

". . . The rule of mutuality is itself based upon policy and practical necessity and justice, as is the whole doctrine of res judicata, and on the same grounds of policy and justice there would seem to be no objection to departing from it where the party affected has been given one adequate opportunity to be heard either personally or by representation."

The requirement of mutuality is in part based upon the due process guarantee of a day in court. Accordingly, although a plaintiff *prevailing* in one suit cannot in a second action upon the same cause of action successfully plead res judicata as against a defendant not a party, or in privity with a party, in the first proceeding, the defendant in the second case may plead res judicata although not a party to the first if in the first the plaintiff *failed to prevail;* the plaintiff having had his day in court on the same cause of action in the first suit, there is no objection to the defendant's waiving his day in court in the second. Glaze v. Citizens' Nat. Bank, 1888, 116 Ind. 492, 18 N.E. 450; Spencer v. Dearth, 1870, 43 Vt. 98; Atkinson v. White, 1872, 60 Me. 396; 35 Yale Law Journal 607-612 "Privity and Mutuality in the Doctrine of Res Judicata"; 9 Virginia Law Register (N.S.) 241-255 "Res Adjudicata: Who Entitled to Plead."

The foregoing being the law, the individual defendants added in the civil complaint, since they are charged as officers of corporations named as defendants in the indictment, and are not charged in any other capacity, may, like privies, invoke the doctrine of res judicata. The two added corporate defendants may do so within the further exception to the strict rule of mutuality just stated, the Government having failed in the criminal case.

### IV.

It having thus been concluded that the causes of action in the criminal case and the instant civil case are the same and that the lack of strict mutuality of parties in the two cases is not an obstacle to application of the doctrine of res judicata, it remains to consider whether any other barrier exists to the operation of that doctrine in the defendants' favor.

It has been stated at the outset of this opinion that acquittal in a criminal case upon submission to a jury in the usual course will not operate to bar a subsequent civil suit on the same cause between the same parties because of the higher degree of proof required in a criminal as compared with a civil case, the necessity of proving criminal intent in a criminal case, Helvering v. Mitchell and companion cases cited supra, and the greater access to evidence and witnesses, including the defendant as a witness, in a civil case, as a result of which a plaintiff's judgment might be obtained in a civil suit notwithstanding that the same cause pursued in a criminal proceeding against the same defendant had failed. But the criminal case to which the pleas of res judicata in the instant civil action relate was disposed of not by acquittal upon submission to a jury in the usual course, but by the granting of the defendants' motions for directed verdict made at the close of the Government's evidence. The defendants contend that this type of disposition of the criminal case makes inapplicable the rule just stated.

A discrimination must here be made: On a motion for directed verdict at the close of the Government's evidence in a criminal case a trial judge may rule in favor of the defendant because although, in the judge's view, substantial evidence has been introduced of each of the elements of the charge and of the defendant's connection therewith, the facts proved by such evidence fail, as a matter of law, in the opinion of the judge, to constitute a public offense. In so ruling he sustains, in the terminology of the common law, a demur-

rer to the evidence, and in effect a demurrer to the indictment—since the evidence reflects the charge. Substantial as distinguished from formal defects in an indictment are not waived by failure to attack them by motion to quash or demurrer prior to trial. Dunbar v. United States, 1895, 156 U.S. 185, 15 S.Ct. 325, 39 L.Ed. 390; United States v. Carll, 1881, 105 U.S. 611, 26 L.Ed. 1135; Berry v. United States, 9 Cir., 1919, 259 F. 203. A demurrer to the evidence "'. . . is defined by the best text writers to be a proceeding by which the court in which the action is depending is called upon to decide what the law is upon the facts shown in evidence, and it is regarded in general as analogous to a demurrer upon the facts alleged in the pleading. When a party wishes to withdraw from the jury the application of the law to the facts, he may, by consent of the court, demur in law upon the evidence, the effect of which is to take from the jury and refer to the court the application of the law to the facts, and thus the evidence is made a part of the record, and is considered by the court as in the case of a special verdict.' Suydam v. Williamson [1857], 61 U.S. 427, 20 How. 427, 15 L.Ed. 978; Van Stone v. Stillwell Mfg. Co. [1891], 142 U.S. [128] 134, [12 S.Ct. 181], 35 L.Ed. [961] 963. . . ." Hopkins v. Nashville, C. & St. L. R. R., 1896, 96 Tenn. 409, 34 S.W. 1029, 1032, 32 L.R.A. 354, 359 (1913 ed.) A disposition upon such a theory of a motion for directed verdict in a criminal case is a basis for a bar under the doctrine of res judicata to the prosecution of a subsequent civil suit on the same cause between the same parties. United States v. Salen, supra. Since such a disposition is made upon the assumption that all of the facts charged are true it involves no question of degree of proof or of availability of witnesses or of evidence and is a determination of the case upon the merits upon a pure question of law. It determines that, as a matter of law, no legal wrong exists in the facts charged and admitted. Absent a violation of law in the facts charged in a criminal case there is no foundation for a subsequent civil suit. If there is no wrong, there is nothing upon which to proceed either criminally or civilly. It follows that if the disposition of the criminal case relied on in the instant civil case as a basis for the defendants' pleas of res judicata was of this type, then the pleas are good and the motions for summary judgment must be granted.

But a trial judge may rule in the defendant's favor on a motion for directed verdict at the close of the Government's evidence in a criminal case on a different ground, i.e., because although, in his view, the indictment charges a public offense, and some evidence has been introduced of each element of the offense as charged and of the defendant's connection therewith, the evidence is not, in the opinion of the judge, substantial, or, if substantial as to some of the elements of the charge, is insubstantial as to others or as to the defendant's connection with the offense; that is to say, the judge may answer in the negative the question—is the evidence sufficient to show that the offense charged was committed and that the defendant committed it. It is the contention of the defendants in the instant case that this type of disposition of a motion for directed verdict also forms a proper basis for a plea of res judicata in a subsequent civil suit, notwithstanding the rule of Helvering v. Mitchell and companion cases cited supra. This contention of the defendants is not justifiable for two reasons: First, the evidence in a criminal case may be insubstantial, as compared with that which might be produced in a subsequent civil suit on the same cause, by reason of the fact that in the criminal case the Government has less access to evidence and witnesses, including the defendant as a witness, than in a civil suit; that is to say, in the civil case, where the Government as plaintiff will have the right to call the defendant as a witness and to use the processes of discovery of evidence, the Government may be able to prevail notwithstanding the failure of its case in the criminal proceeding. Second, a trial judge in this type of ruling upon a motion for directed verdict at the close of the Government's evidence in a criminal case, considers not merely whether the evidence is substantial, in the sense of that term as used in civil cases, but in addition whether it *could* properly convince a jury beyond a reasonable doubt of the defendant's guilt. It is true that the judge must not, at this stage of the case, inject into the decision his own judgment in respect of questions of credibility. He must assume the truth of the Government's *evidence* and give the Government the benefit of all legitimate

inferences to be drawn therefrom. But he determines also whether such evidence and inferences, so taken to be true, will serve *to sustain* a verdict of conviction. If his conclusion is in the affirmative, then he must send the case to the jury (even though, were he free to weigh the evidence in the sense of passing upon its credibility, he would himself acquit). If his conclusion is in the negative he must direct a verdict in the defendant's favor. But this he cannot do without deciding that such evidence and inferences *could* not convince the jury beyond a reasonable doubt, i.e., he takes into account that higher degree of proof required in criminal cases as compared with civil. The defendants dispute this proposition.

It is true that the rule in the Federal courts, stated in general terms, is that a scintilla of evidence is insufficient to take a case to the jury—that evidence must be "substantial"—that if the plaintiff's evidence, taking it as true and according the plaintiff the benefit of legitimate favorable inferences, is "substantial," the case goes to the jury. Pennsylvania R. Co. v. Chamberlain, 1933, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Gunning v. Cooley, 1930, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Baltimore & Ohio R. Co. v. Groeger, 1925, 266 U.S. 521, 45 S.Ct. 169, 69 L.Ed. 419; Slocum v. New York Life Ins. Co., 1913, 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, Ann. Cas.1914D, 1029; Jackson v. Capital Transit Co., 1938, 69 App.D.C. 147, 99 F.2d 380; Hopkins v. Baltimore & Ohio R. Co., 1936, 65 App.D.C. 167, 81 F.2d 894. And conventionally "substantial evidence" is merely such evidence as a reasonable mind might accept as adequate to support a conclusion. Cf. Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 229, 230, 59 S.Ct. 206, 83 L.Ed. 126. One criminal case, Hays v. United States, 8 Cir., 1916, 231 F. 106, supports the contention of the defendants; and they cite also in support of their contention Cady v. United States, 1923, 54 App.D.C. 10, 293 F. 829, and Stilson v. United States, 1919, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154. In Hays v. United States, Hays was jointly indicted with a woman named Lessie Jones for violating the White Slave Traffic Act, 18 U.S.C.A. § 397 et seq., one count of the indictment charging the furnishing of transpor-

tation to a seventeen year old girl for an interstate journey for an illicit purpose and another charging persuading and inducing the girl to make the same journey for the same purpose. At the conclusion of the Government's case, no evidence having been introduced by the defendants, a motion was made for a directed verdict and denied, and there was then a conviction on both counts. Hays appealed to the Circuit Court of Appeals and assigned as error the denial of the motion. He conceded on the appeal that there was substantial evidence to establish all of the elements of the offenses charged, but urged that such evidence was insufficient to convince the jury beyond a reasonable doubt. The Court of Appeals held that there was no error. It said:

". . . Where there is substantial evidence tending to prove each element of the offense charged, the verdict of the jury is final. Whether the evidence is of sufficient probative force to convince the mind beyond a reasonable doubt is addressed solely to the judgment of the jury. The court can do no more than accurately state the rule of law. There is no way by which the doctrines of reasonable doubt and presumption of innocence can be properly used to create a new zone of error, or devolve upon appellate courts the duty to examine evidence and determine its probative force. . . ." [231 F. at page 108] [19]

In Cady v. United States the defendants were convicted of feloniously entering with intent to commit larceny a garage occupied by another. The Government's evidence was that the defendants had been found in the garage, whereupon they walked out without explanation; there was also evidence that someone had broken in. The defendants did not take the witness stand and did not introduce any evidence. A motion for directed verdict, made upon the ground that mere presence of the defendants in the garage could not raise a presumption of felonious intent, was denied. On appeal this ruling was held correct, the United States Court of Appeals for the District of Columbia saying:

"We are reminded of the well-established and oft-repeated principle that, unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the

---

[19] Numerous cases were cited in support of this proposition. Examination of each of them, however, indicates that only Cady v. United States and Stilson v. United States referred to in the text are worthy of comment.

accused, and, where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a conviction. But it is not applicable here, because the facts established are such that the jury was fully warranted in deducing from them inferences which excluded every other hypothesis but that of guilt." [54 App.D.C. at page 11, 293 F. at page 830]

In Stilson v. United States, where again the contention upon appeal was that a motion for directed verdict should have been granted upon the ground that there was no substantial evidence to support a verdict of guilty, the Court said:

"As to the contention that there was no evidence to warrant the convictions of the accused—it must be borne in mind that it is not the province of this court to weigh testimony. It is sufficient to support the judgment of the District Court, if there was substantial evidence inculpating the defendants which, if believed by the jury, would justify the submission of the issues to it. . . ." [250 U.S. at page 588, 40 S.Ct. at page 30, 63 L.Ed. 1154]

While Hays v. United States does both in ruling and terms support the defendants' contention, it is from another Circuit and is therefore not controlling. While Cady v. United States and Stilson v. United States may perhaps be said, in using the phrase "substantial evidence" without reference to the rule of proof in criminal cases and without statement that the evidence must be such that a verdict for the Government could be *sustained*, to lend some verbal countenance to the defendants' contention, in neither Stilson v. United States nor Cady v. United States was there presented and determined or discussed the exact question whether a trial judge, in deciding in a criminal case whether there is substantial evidence, passes upon the sufficiency of the evidence in the sense of determining whether it could convince a jury beyond a reasonable doubt. Hammond v. United States, 1942, 75 U.S.App.D.C. 397, 127 F.2d 752, authoritatively states the rule for and reflects what has long been the practice of trial judges in the District of Columbia in determining in criminal cases the question whether there is substantial evidence for submission to a jury. That Hammond v. United States was decided after the trial judge directed the verdict in the defendants' favor in criminal case No. 66,008 is not material. Cf. Ruppert v. Ruppert, 1942,

77 U.S.App.D.C. 65, 134 F.2d 497. In Hammond v. United States the appellant was indicted for assault with intent to commit rape. The evidence for the Government was that around two o'clock in the morning he went to the home of his mother-in-law with whom his wife and baby were living, went into the bedroom of a seventeen year old sister-in-law, pulled off the covers and touched her private parts; she awakened and screamed, and the appellant ran from the house. After the submission of this evidence there was a motion by the appellant for a directed verdict, which was denied. It was renewed at the conclusion of the entire case and again denied. On appeal it was held that it was error not to have directed a verdict. The Court of Appeals pointed out that the elements necessary to be proven were (1) an assault; (2) an intent to have carnal knowledge; (3) a purpose to carry this intent into effect with force and against consent. Quoting from Isbell v. United States, 8 Cir., 1915, 227 F. 788, 792, the court said:

". . . Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt it is the duty of the trial judge to instruct the jury to return a verdict for the accused, and where all the substantial evidence is as consistent with innocence as with guilt it is the duty of the appellate court to reverse a judgment against him." [75 U.S.App.D.C. at page 398, 127 F.2d at page 753]

The court then reviewed the evidence as follows:

"In the light of the circumstances we have related, we think it impossible that a jury of reasonable men *could have fairly reached* the conclusion that appellant, in what he did, necessarily intended to commit rape. True enough, his intent can only be determined by his acts. But on the facts shown here, the conclusion that he intended rape would be pure conjecture. Appellant was himself at the time fully dressed. It is not claimed that he had exposed his person or that he said anything indicating a purpose to have sexual intercourse. The room was lighted and was occupied, not only by his sister-in-law, but by two children, and the adjoining room was occupied by his mother-in-law and wife. Except that he used his hand to touch the body of the girl, he did nothing to carry out a carnal purpose. To assume in these circumstances that he intended to force his sister-in-law is neither reasonable nor credible. That

he had a lustful desire is not enough. There must have been the intent to ravish if the desire were denied. That he was guilty of a serious offense goes without saying, cf. Beausoliel v. United States, 71 App.D.C. 111, 107 F.2d 292, but that he was guilty of attempted rape we think may not be inferred from the evidence on which the Government relied. . . ." [Italics supplied] [Ibid.]

Numerous authorities were then cited and the court concluded:

"The above cited cases and many others which might be cited are to the effect that to warrant conviction the evidence must show beyond a reasonable doubt that intercourse was the immediate design and that force was intended to its accomplishment. In the instant case, it can just as well be assumed that appellant's purpose was to look or to fondle or to have intercourse if consent were forthcoming, rather than to ravish. That he should be punished goes without saying—but not for attempted rape." [Ibid.]

In Hammond v. United States the trial judge was confronted by evidence, the truth of which on the motion for directed verdict he was bound to assume, as to the circumstances under which the alleged assault with intent to commit rape occurred and as to how the defendant conducted himself. But in determining whether the trial judge erred in his refusal to direct a verdict, the Court of Appeals considered, as indicated by the quotations above, not merely whether the evidence was substantial in the sense in which that word is used in civil cases, i. e., such as a reasonable mind might accept as adequate to support a conclusion, but also whether it was sufficient to convince beyond reasonable doubt. Therefore, the decision necessarily constitutes a ruling for this jurisdiction that a trial judge upon motion for a directed verdict at the close of the Government's evidence in a criminal case must not merely assume the truth of the Government's evidence and give the Government the benefit of legitimate inferences to be drawn therefrom, but must also consider whether or not the evidence, so regarded, could properly convince a jury beyond a reasonable doubt, and must, if he reaches a negative conclusion on this question, grant the motion.

It is to be noted further that the rule as stated in the civil cases cited supra for guidance of a trial judge in passing upon a motion for directed verdict is that it is the duty of the judge to direct a verdict in favor of one of the parties where the evidence would be "insufficient to support a different finding," Baltimore & Ohio R. Co. v. Groeger; or where a verdict for the opposite party if returned "would have to be set aside," Gunning v. Cooley and Slocum v. New York Life Ins. Co. In Pennsylvania R. Co. v. Chamberlain the phrasing of the rule was "whenever in the trial of a civil case the evidence is clearly such that if a verdict were rendered for one of the parties the other would be entitled to a new trial, it is the duty of the judge to direct the jury to find according to the views of the court." As put in Jackson v. Capital Transit Co. and Hopkins v. Baltimore & Ohio R. Co., the test is "whether there is any [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." If these phrasings of the rule be applied in respect of criminal cases where evidence, in order to sustain a verdict, must be convincing beyond reasonable doubt rather than merely, as in civil cases, such as a reasonable mind might accept as adequate to support a conclusion, these cases lend support to the contention of the Government that the function of a trial judge in a criminal case, in passing on a motion for directed verdict, must ·be discharged in the light of the higher requirement of proof in criminal cases as compared with civil.

The contention of the defendants in this aspect of the instant case is in effect that the function of a trial judge on motion for directed verdict at the close of the plaintiff's evidence is the same in both civil and criminal cases, in that in both the judge assumes the truth of the plaintiff's evidence and gives the plaintiff the benefit of inferences legitimately to be drawn therefrom, and that, having done that, his further function is restricted to determining whether the evidence so regarded as true is substantial, i. e., more than a scintilla, such as a reasonable mind might accept as adequate to support a conclusion. If he determines that it is, so argue the defendants, the judge must send the case to the jury whether in a criminal or a civil proceeding, because if the evidence is such as a reasonable mind might accept as adequate to support a conclusion it is sufficient to support a finding or verdict. But the difficulty with this contention is that it omits to consider that in a criminal case evidence *is not sufficient to support a verdict* if it is merely

such as a reasonable mind might accept as adequate to support a conclusion; it must be more than that; it must be adequate to prove guilt beyond a reasonable doubt. In short, while it is the duty of the trial judge in both the criminal and the civil case to determine on motion for directed verdict whether the evidence is "substantial," that term has a meaning in criminal cases different from that which it has in civil cases. That is the conclusion necessitated by Hammond v. United States, supra, which is controlling for the District of Columbia.

## V.

It is apparent from the conclusions reached above that the critical question, upon the answer to which the fate of the motions for summary judgment depends, is— what was the ground upon which the trial judge granted the defendants' motions for directed verdict in criminal case No. 66,008. In summary: It has been shown (in topic II) that the cause of action pursued by the Government in the criminal case is the same as that upon which the instant civil suit is brought. It has been demonstrated (in topic III) that the lack of literal identity in parties in the two suits does not forbid application of the doctrine of res judicata, the defendants added in the civil case being within exceptions to the rule requiring strict mutuality. It has been concluded (in topic IV) that if, in sustaining a defendant's motion for a directed verdict at the close of the Government's evidence in a criminal case, the trial judge rules that, although substantial evidence has been introduced of each of the elements of the charge and of the defendant's connection therewith, the facts proved by such evidence fail to constitute a public offense, i. e., if the ruling is in effect the sustaining of a demurrer to the evidence and indictment, the disposition of the motion on such a ground will be a bar, under the doctrine of res judicata, to the prosecution of a subsequent civil suit between the same parties upon the same cause. But it has also been concluded (in topic IV) that if in a criminal case a trial judge sustains a defendant's motion for directed verdict upon the ground that, although the indictment charges a public offense, the evidence introduced by the Government to prove commission of the same and the defendant's connection

therewith is not substantial, disposition of the motion on such ground will not operate as a bar to the prosecution of a subsequent civil suit between the same parties upon the same cause.

What, then, was the ground upon which the trial judge in the criminal case disposed, favorably to the defendants, of their motions for directed verdict made at the close of the Government's evidence?

At the oral argument and in the briefs filed by the parties on the motions for summary judgment it was sought to characterize the ruling of the trial judge in the criminal case by excerpts from his remarks at the time he granted the motions for directed verdict. As shown by the affidavits of the parties filed in connection with the motions for summary judgment, these remarks were as follows: [20]

"[1] The Court: The difficulty in this case is this: U. S. G., so far as its gypsum business is concerned, has the whole world by the tail on a down-hill pull, and the public has resented it. That is about the size of it, but there is nothing illegal about it, because they have a patent. That is the whole thing, as far as I can see. I have been listening here for five weeks and that is all I see." [Tr. 2945]

"[2] The Court: That's one view. Unless there is not any view which is consistent with their innocence, the case cannot go to the jury." [Tr. 2966]

"[3] Now with all that in mind, with all those legal rights in mind, with all those natural human conclusions involved, the Court is perfectly clear that the evidence does not show anything which is necessarily inconsistent with the innocence of the defendants." [Tr. 3050]

"[4] Now, certainly in a criminal proceeding, it is perfectly clear that where reasonable minds could not differ on the fact that the testimony is consistent with innocence—it may be consistent with guilt —but if the testimony can be so construed among men of reasonable minds—in other words, if all men of reasonable minds would not reach the conclusion that innocence was possible under the facts, then the jury should be instructed to find a verdict of not guilty." [Tr. 3050-1]

---

[20] The remarks of the trial judge as here printed are not in the order in which they were presented in the affidavits of the parties; they are rearranged so as to appear in the sequence of the transcript pages from which it appears they were taken. The remarks are numbered for convenience in reference.

"[5] The Court: Ladies and gentlemen of the jury, in this case the Court finds that there is no evidence of an illegal conspiracy.

"The law as applied to this particular case under the indictment is that there [these] defendants had a right insofar as their sales were concerned, to agree upon a price and fix a price and to sell at that price, and they also had a right to refuse to sell to anyone they saw fit.

"And the Court is of the opinion, clearly of the opinion that the testimony in the case is consistent, entirely consistent with the lawfulness of the defendants' conduct, and therefore the Court is compelled to instruct you to find a verdict of not guilty as to all of the defendants on each count of the indictment." [Tr. 3051]

It will be seen that these remarks of the judge do not clearly answer the question as to the ground of his ruling. The statement of the judge in excerpt 1 would seem to indicate that he was in effect sustaining a demurrer to the evidence, and the same is true of the statement in the second paragraph of excerpt 5. But from the comments made by him in excerpts 2, 3 and 4, and in the third paragraph of excerpt 5, it would appear that the judge was not sustaining a demurrer to the evidence but was ruling that the evidence was not substantial. The statement in the first paragraph of excerpt 5 is ambiguous: it may mean that, taking the evidence as true and as establishing the elements charged in the indictment, no public offense was, in the opinion of the judge, proved, i. e., so interpreted, the comment would indicate that the judge was sustaining a demurrer to the evidence; but this statement is also construable as meaning that although an illegal conspiracy was charged the proof thereof was not, in the view of the judge, substantial.

Moreover, the nature of a trial judge's ruling on a motion for directed verdict is not to be determined from his remarks made at the time he grants the motion and directs the jury to bring in a verdict of not guilty. Not even a formal opinion of a trial judge is a determinative part of the record. United States v. Wells, 1931, 283 U.S. 102, 120, 51 S.Ct. 446, 75 L.Ed. 867; Chapman v. Bowen, 1907, 207 U.S. 89, 91,

28 S.Ct. 32, 52 L.Ed. 116; Stone v. United States, 1896, 164 U.S. 380, 383, 17 S.Ct. 71, 41 L.Ed. 477; Saltonstall v. Birtwell, 1893, 150 U.S. 417, 419, 14 S.Ct. 169, 37 L. Ed. 1128. The legal meaning of the decision of a court is to be ascertained by viewing the bare ruling in the light of the points actually presented to the court for decision, this for the reason that only in respect of questions so presented is a court's decision authoritative. The remarks or statements of the judge made at the time of his ruling may illuminate, but they cannot authoritatively characterize, the court's decision. It follows that, in order to answer the critical question which is determinative of the motions for summary judgment in the instant case, the motions for directed verdict themselves and the grounds thereof must be examined.

The motions for directed verdict in the criminal case were made by the defendants separately as follows: A motion by the United States Gypsum Company, Oliver M. Knode, William L. Keady, H. Frank Sadler, Sidney F. Bartlett, and Ernest A. Gallagher (hereinafter referred to as the United States Gypsum Company et al.) ; a motion by the Certain-teed Products Corporation; a motion by Arthur R. Black; a motion by the Ebsary Gypsum Company, Inc.; a motion by the National Gypsum Company, Melvin H. Baker and Ralph F. Burley (hereinafter referred to as the National Gypsum Company et al.) ; a motion by the Newark Plaster Company.[21] As described in an affidavit of the defendants filed in connection with the motions for summary judgment, the grounds of the motions for directed verdict thus severally made were these:

*Motion of United States Gypsum Company et al.:*

"[1] . . . the Government has failed to introduce evidence sufficient to be considered by the jury that said defendants ever became a party to or engaged in an unlawful combination and conspiracy to establish, fix and make uniform and non-competitive the distributors' resale prices to dealers and consumers, including the various terms and conditions of sale for gypsum board purchased from the manufacturers by the distributors, and resold by the distributors in commerce between the States

---

[21] The defendant Warren F. Henley, described in the indictment as Merchandise Manager, Gypsum Division, of the Certain-teed Products Corporation, did not, so far as appears from the affidavits filed in connection with the motions for summary judgment, make or join in a motion for directed verdict.

and the District of Columbia, in violation of Section 3 of the Act of Congress of July 2, 1890, as charged in and by said indictment returned in this case."

2. Identical with ground 1 except that after the word "distributors" in the phrase "and resold by the distributors" there were added the words "in interstate commerce, and."

3. Identical with ground 2 except that the words "in violation of Section 1" were substituted for the words "in violation of Section 3."

"[4] . . . the Government has failed to introduce evidence sufficient to be considered by the jury that the combination and conspiracy alleged in said indictment, and in each count thereof, to have been engaged in by the manufacturers of gypsum board and lath named in the indictment, certain of the officers and employees of gypsum manufacturers and certain corporations referred to as distributors, was ever formed, engaged in or carried out by said alleged conspirators."

"[5] . . . there is a fatal variance between the evidence introduced by the Government and that charge attempted to be alleged in each count of the indictment, in that such evidence, though not sufficient to be considered by the jury for the purpose hereinafter referred to, or for any other purpose, is designed to show the existence of a number of separate and unrelated combinations and conspiracies, having different parties, objectives and subject matters; whereas, each count of the indictment attempts to charge, and is based upon one and the same combination and conspiracy involving all the defendants named in the indictment; that in view of the premises there is no evidence whatsoever that the defendants, on whose behalf this motion is filed, have committed any of the offenses with which they are actually attempted to be charged in the indictment, and said defendants have been substantially prejudiced by the Government's attempt to try them on a number of separate and unrelated charges, not properly triable together, and of which it was not given fair notice by the indictment, or any count thereof."

"[6] . . . the evidence is insufficient to show that any combination or conspiracy alleged in the indictment existed, or that any defendant was a party to, or committed any act in furtherance of any such combination or conspiracy, within three years of the date of the indictment, and that the charges of the indictment are therefore barred by the statute of limitations."

*Motion of Certain-teed Products Corporation:*

1, 2 and 3. Identical with grounds 1, 2 and 3 of the motion of the United States Gypsum Company et al.

"4. . . . the prosecution has failed to introduce evidence sufficient to be considered by the jury that Certain-teed Products Corporation, with the knowledge, approval, or consent of any executive officer or of any other duly authorized agent of said corporation, ever did any of the acts or things by which said alleged combination and conspiracy is charged in said indictment, and in each count thereof, to have been effectuated."

5. Identical with ground 4 of the motion of the United States Gypsum Company et al.

6. Identical with ground 5 of the motion of the United States Gypsum Company et al.

*Motion of Arthur R. Black:*

1, 2, 3, 4 and 5. Identical with grounds 1, 2, 3, 4 and 5 of the motion of the United States Gypsum Company et al.

*Motion of Ebsary Gypsum Company, Inc.:*

1, 2 and 3. Identical with grounds 1, 2 and 3 of the motion of the United States Gypsum Company et al.

4. Identical with ground 4 of the motion of the Certain-teed Products Corporation.

5. Identical with ground 4 of the motion of the United States Gypsum Company et al.

6. Identical with ground 5 of the motion of the United States Gypsum Company et al.

*Motion of National Gypsum Company et al.:*

"[1] . . . the same grounds as those advanced by Mr. Bromley [counsel for the defendants United States Gypsum Company et al.] on behalf of the defendants he represents. In brief, we move for a directed verdict on the ground that the evidence is insufficient under the law to submit the case to the jury, . . . ."

"[2] . . . as to counts 1 and 2, that no proof whatever has been adduced to show that defendants' alleged acts have constituted an unreasonable restraint of

636

trade between the States and the District of Columbia."

"[3] . . . as to count 3, we move for a directed verdict on the ground that there is no proof in the record that, as charged in the indictment, dealers in the District of Columbia are in competition with dealers in Maryland and Virginia in the resale of gypsum products, no proof that prices for gypsum products in Maryland and Virginia fluctuated directly with prices for gypsum products in the District of Columbia, no proof that a reduction of price of gypsum products in the District of Columbia is almost invariably accomplished by a reduction in price of gypsum products within the States of Maryland and Virginia, and lastly, no proof that dealers in gypsum products in Maryland, Virginia, North Carolina, South Carolina, Georgia, Kentucky, Tennessee, Arkansas and Mississippi were served by one or more of the distributors from sales offices located in the District of Columbia, all as alleged in count 3 of the indictment."

"[4] . . . the offenses herein are barred by the Statute of Limitations. [This reiterates the adoption of ground 6 of the motion of the defendants United States Gypsum Company et al.] "

*Motion of the Newark Plaster Company:*

"[1] . . . on the ground that the Government has failed to establish a prima facie case against Newark Plaster Company under the indictment, and also on all of the other grounds urged by other counsel on behalf of other defendants."

In addition to their several motions for a directed verdict of not guilty, the defendants United States Gypsum Company et al., Certain-teed Products Corporation, and Arthur R. Black also moved to dismiss the indictment upon three grounds printed in the margin,[22] and the defendant Certain-teed Products Corporation and the defendant Arthur R. Black each added these grounds of their motions to dismiss to their motions for directed verdict. The defendants National Gypsum Company et al. made no motion to dismiss the indictment but did by adoption add to their motion for directed verdict all three of the grounds of the motion to dismiss of the United States Gypsum Company et al.[23] The defendant

---

[22] "[1] . . . the venue of the trial of each of the offenses attempted to be alleged in said indictment, is as to said defendants improper and violative of their constitutional rights, and this court is without jurisdiction to proceed against them, in that the Government has failed to introduce evidence sufficient to be considered by the jury that any of the offenses attempted to be alleged in the indictment, or any count thereof, has been committed by the defendants or any combination or conspiracy attempted to be alleged in the indictment, or any count thereof, has been entered into or continued, or that any overt act pursuant thereto has been done jointly or by any person or corporation whose acts might be binding upon them, in the District of Columbia, within three years prior to the return of the indictment, as required by the Sixth Amendment to the Constitution of the United States."

"[2] . . . the venue of the trial of the offenses attempted to be alleged in said indictment, is, as to said defendants, improper and violative of their constitutional rights, and this court is without the jurisdiction to proceed against them, in that the Government has failed to introduce evidence sufficient to show that any of the offenses attempted to be alleged in the indictment, or any count thereof, has been committed in the District of Columbia, as required by Article 3, Section 2, Clause 3, of the Constitution, and the Sixth Amendment thereto."

"[3] . . . the venue of the trial of the offense attempted to be [alleged] in count 3 of said indictment, charging that the defendants and corporations therein named as co-conspirators, and others, have been continuously engaged in a wrongful and unlawful combination and conspiracy in restraint of trade and commerce in gypsum board among the States in violation of Section 1 of the Sherman Act, as amended, is as to certain defendants, improper and violative of their constitutional rights, and this Court is without jurisdiction to proceed against them in that it is not alleged in said count 3 of the indictment that said alleged combination or conspiracy was formed in the District of Columbia, and it appears that any such alleged offense, if committed at all, must have been committed in a State, and not in the District of Columbia, and that there is no evidence sufficient to show that the offense attempted to be alleged in said Count 3 of said indictment, was formed or committed in the District of Columbia, all as required by Article 3, Section 2, Clause 3 of the Constitution of the United States, and the Sixth Amendment thereto."

[23] Quotation 1 above set forth under the sub-title "Motion of National Gypsum Company et al." refers solely to the motion of the defendants United States Gyp-

Newark Plaster Company made no motion to dismiss the indictment, but did, in making its motion for directed verdict "also on all of the other grounds urged by other counsel on behalf of other defendants," include within its motion for directed verdict the three grounds of the motion to dismiss the indictment of the United States Gypsum Company et al. The defendant Ebsary Gypsum Company, Inc., made no motion to dismiss the indictment and embodied in its motion for directed verdict none of the grounds of the motion to dismiss of the defendants United States Gypsum Company et al. The motions to dismiss the indictment are not in terms referred to in the motions for summary judgment and, so far as appears from the showing made under the latter motions, were not acted upon by the trial judge (except as he may be said to have ruled in substance, although not in form, upon the motions to dismiss when he granted the motions for directed verdict of such of the defendants as embodied in their motions for directed verdict the grounds of the motions to dismiss). The motions to dismiss the indictment, as will be noted from the grounds thereof as printed in the margin, go not to the merits of the criminal case but only to venue and to the statute of limitations.

The upshot of the foregoing is this: *First,* since the motions to dismiss the indictment and the grounds thereof go not to the merits of the criminal case, they are irrelevant to the pleas of res judicata upon which the motions for summary judgment in the instant case are based. The pleas, as argued by the defendants both orally and in their briefs on the motions for summary judgment, are based upon the theory only that the disposition of the criminal case on the motions for directed verdict was a disposition upon the merits. Therefore the motions to dismiss the indictment may be disregarded, whether looked at as such or as the grounds thereof are embodied in the motions for a directed verdict of the defendants other than the United States Gypsum Company et al. and the Ebsary Gypsum Company, Inc.

*Second,* ground 6 of the motion for directed verdict of the defendants United States Gypsum Company et al. and the same ground as embodied in the motions for directed verdict of the defendants National Gypsum Company et al. and the defendant Newark Plaster Company, as above set forth, may also be disregarded as irrelevant—since this ground, again, goes not to the merits of the criminal case but to the statute of limitations; there is no issue as to the statute of limitations under the pleadings in the instant case.

*Third,* the motions for directed verdict themselves, in view of the grounds thereof as above set forth, were clearly not in the nature of demurrers to the evidence and indictment. The contention was not made in such motions that although substantial evidence had been introduced of the elements of the charge and of the defendants' connection therewith, the facts proved by such evidence failed to constitute a public offense. On the contrary the grounds of the motions were solely that the evidence introduced by the Government to prove the offense charged and the connection of the defendants therewith was not substantial. It follows from this and from the reasoning and authorities set out in topic IV that the disposition, in favor of the defendants, of the motions for directed verdict in the criminal case cannot operate, under the pleas of res judicata in the instant case, as a bar to the prosecution of the latter. The trial judge, in granting the motions for directed verdict upon the grounds stated in the motions must, in the proper exercise of his duty, have considered not merely whether the evidence was substantial in the sense of that term as used in civil cases, but also whether it could properly convince a jury beyond a reasonable doubt of the defendants' guilt, i. e., must have taken into account that higher degree of proof re-

sum Company et al., for a directed verdict as distinguished from the motion of the latter defendants to dismiss the indictment. But the quotation was followed by the further statement on behalf of the defendants National Gypsum Company et al.: "On the grounds that no sufficient proof has been adduced to show the offenses alleged in counts 1, 2 and 3 were committed in the District of Columbia, and therefore, that there is no proof to show jurisdiction or venue in this court."

Since venue is not mentioned in any of the grounds of the motion for directed verdict of the defendants United States Gypsum Company et al. this assertion by the defendants National Gypsum Company et al. of insufficient proof of jurisdiction or venue was apparently an adoption by the defendants National Gypsum Company et al. as grounds of their motion for a directed verdict of the three grounds of the motion to dismiss of the defendants United States Gypsum Company et al.

quired in criminal cases as compared with civil. And the evidence might have lacked substantialness in part because the Government had less access to evidence and witnesses, including the defendants as witnesses, in the criminal case than it will have in the instant civil proceeding. In short, to the disposition of the criminal case in the defendants' favor, in view of the grounds upon which the motions for directed verdict were made, the rule of Helvering v. Mitchell and companion cases cited supra, applies. Therefore the termination of the criminal case in the defendants' favor cannot, despite the identity of causes and substantial identity of parties in the two cases, operate as a bar under the pleas of res judicata to the prosecution by the Government of the instant civil suit.

While I thus arrive at the conclusion, reached also by the majority, that the defendants' motions for summary judgment must be denied, I feel, with deference to my brothers, constrained to say that I think the motions ought not be disposed of in the manner in which they are. As I understand the majority opinion, its fundamental ground is a general proposition that defendants in a civil case under the antitrust laws cannot invoke the doctrine of res judicata through pleas based upon disposition, in their favor, of a prior criminal case on the same cause, for the reason that the antitrust statutes contemplate both a criminal and a civil proceeding in respect of the same wrong. And as I read the majority opinion, this general proposition is asserted to be true quite apart from any question of difference between criminal and civil cases in respect of the degree of proof required and the accessibility of evidence and witnesses. The majority opinion reaches its conclusion, without discussing this difference so far as concerns the question whether it is involved in such motions for directed verdict as were made and acted upon in the criminal case upon which the defendants' pleas of res judicata are based.

With this general proposition laid down in the majority opinion I cannot agree. It is true that the antitrust statutes authorize both criminal and civil proceedings, and they of course contemplate that if a conviction is obtained in a criminal case a civil action may also be brought—that is to say, the statutes permit punishment of defendants criminally for acts denounced and permit also restraint of further commission by the defendants of the same wrongful acts. But I think—laying aside the question of difference between criminal and civil cases in respect of the degree of proof required and the accessibility of evidence and witnesses—that it does not follow that defendants can be subjected to a civil proceeding notwithstanding that in a prior criminal case brought against them upon the same cause there has been an adjudication upon the merits that the acts charged are not wrongful. The sweep of the majority opinion, as I read it, is so broad as to hold precisely that, i. e., that even if in a criminal case it were determined upon demurrer to the evidence, or even upon demurrer to an indictment, that the acts charged as wrongful did not constitute a violation of the antitrust laws, still the same defendants might be pursued again by the Government, in a civil proceeding, for exactly the same acts. If a court of competent jurisdiction has once adjudicated that given acts charged as a violation of the antitrust laws are not wrongful, there is, I think, apart from the question of difference between criminal and civil cases in respect of degree of proof required and accessibility of evidence and witnesses, no just or sensible basis upon which a civil suit to restrain the same acts can be permitted. If no wrong has been committed, what is there to restrain? Surely the antitrust laws do not contemplate that the considered decision of a Federal court upon the merits in a criminal proceeding that no wrong has been committed shall be disregarded. As I have demonstrated in topic I of this separate opinion, none of the cases cited by the Government as supporting the general proposition upon which the majority opinion is founded do so.[24] So far as here pertinent Standard Sanitary Mfg. Co. v. United States, specifically relied upon in the majority opinion, holds merely, as I have shown in topic I of this separate opinion, that successive or simultaneous actions, criminal and civil, may be brought under the antitrust laws and that the order

[24] The contention of the Government in this aspect of the case was put in terms of an assertion that the doctrine of res judicata is not applicable if it would "limit the effectiveness" of a Federal statute and that this is true in respect of the antitrust laws. But in effect the contention was the same as the general proposition laid down in the majority opinion and the same reason as that stated by the majority was urged to support it.

of trial of such actions is a matter of discretion for the trial court; the case involves no question of res judicata. Murphy v. United States, also specifically relied upon in the majority opinion, does not involve the antitrust laws at all; it arose under the prohibition laws. Moreover, it was not decided upon the theory that the doctrine of res judicata cannot be invoked by defendants in a civil case in a situation where statutes make both criminal and civil remedies available to the Government. It was decided upon the ground that there is a higher degree of proof required in a criminal case than in a civil and, because of the necessity of establishing in a criminal case the element of intent, a difference in issues. Not only do the cases relied upon by the Government and the majority fail to support the proposition that, apart from the question of difference between criminal and civil cases in respect of degree of proof required and accessibility of evidence and witnesses, defendants proceeded against civilly under the antitrust laws, after a disposition in their favor of a prior criminal case, cannot invoke the doctrine of res judicata, but also we have been cited to no legislative history lending credit to that proposition. Moreover, the Supreme Court has held that the doctrine of res judicata is available to the Government against defendants in a civil action under the antitrust laws where a prior criminal decision has been adverse to the same defendants on a question of fact. Local 167 v. United States, cited in topic I of this separate opinion. The general proposition, contended for by the Government and announced by the majority as the law, is wholly novel. I think that such an innovation, if it is to be made, should have legislative, not judicial, origin.

I feel constrained to say also that I think the court ought not dispose of the motions for summary judgment without ruling upon the critical contention of the defendants that the holding of Helvering v. Mitchell and like cases (that the doctrine of res judicata will not operate in a civil suit where the plea of res judicata is based upon acquittal by a jury in a criminal proceeding) does not apply where decision of a criminal case in favor of a defendant has been on a motion for a directed verdict. While I have expressed my view on this subject in this separate opinion, there is no ruling thereon by a majority of the court. I think the defendants are entitled to a ruling by a majority.